MANCHESTER LINERS, Limited, v. VIRGINIA–CAROLINA CHEMICAL CO.

(District Court, E. D. North Carolina. Jan. 29, 1912.)

1. SHIPPING (§ 39*)—CONSTRUCTION OF CHARTER PARTY.
    A charter party is to be construed in the light of the nature and details of the adventure contemplated by the parties, giving to the terms their plain ordinary or popular meaning, unless they have generally in respect to the subject-matter, as by the known usages of trade or the like, acquired a peculiar sense, distinct from their popular sense.
    [Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 141–148; Dec. Dig. § 39.*]

2. SHIPPING (§ 45*)—CONSTRUCTION OF CHARTER PARTY.
    Where a charter party contains a provision, "Captain to sign bills of lading as presented to him without prejudice to this charter party," its language cannot be controlled by the terms of the bill of lading.
    [Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 177–181; Dec. Dig. § 45.*]

3. SHIPPING (§ 47*)—CONSTRUCTION OF CHARTER PARTY—"PORT OF DISCHARGE."
    Where the "port of discharge" designated in a charter party is one at which there is a customhouse, the word "port" is to be construed in its ordinary and commercial sense, as meaning the particular place named,

and not any place within the boundaries of the revenue port or the district for which such place is the port of entry.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 182, 183; Dec. Dig. § 47.*

For other definitions, see Words and Phrases, vol. 6, pp. 5456–5457.]

4. SHIPPING (§ 47*)—CONSTRUCTION OF CHARTER PARTY—PORT OF DISCHARGE.

Under a charter for the carriage of a cargo of manure salt used in the manufacture of fertilizers from a German port to Wilmington, N. C., at and near which city there were large fertilizer works having landing docks, the vessel was not authorized to demand discharge at a point 30 miles below Wilmington where there were no such works, merely because the term "port of Wilmington" was used elsewhere in the charter and in the bill of lading.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 182, 183; Dec. Dig. § 47.*]

5. SHIPPING (§ 34*)—CHARTER PARTY—LAW GOVERNING CONSTRUCTION.

A charter of an English ship owned by an English company to a German company for the carriage of a cargo from Germany to the United States, made in Germany, but in the English language, held governed as to its construction by the law of Germany where the general presumption that such was the intention of the parties was strengthened by an express provision to that effect in the bill of lading.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 120; Dec. Dig. § 34.*]

6. EVIDENCE (§ 541*)—COMPETENCY OF EXPERT—LAW OF FOREIGN COUNTRY.

A practicing attorney, graduated from the law department of a German university, and who practiced and acted as judge in the German courts for a number of years, during which time he had occasion to take up and decide cases involving the admiralty law, held competent to testify as an expert as to the maritime law of Germany upon a question to which he had given special study.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 2354; Dec. Dig. § 541.*]

7. SHIPPING (§ 47*)—CONSTRUCTION OF CHARTER PARTY—COST OF LIGHTERAGE —GERMAN LAW.

According to the maritime and admiralty law of Germany and the construction by the German courts of a clause in a charter party requiring the ship to discharge at a port named, or "as near thereunto as she may safely get," the master is relieved from proceeding with his ship and cargo to the port where the water is not of sufficient depth, but not from his obligation to deliver the cargo at his expense in the port of destination unless a contrary intention appears, and is liable for the expense of necessary lighterage.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 182, 183; Dec. Dig. § 47.*]

In Admiralty. Suit by the Manchester Liners, Limited, owner of the steamship Manchester Miller, against the Virginia-Carolina Chemical Company. Decree for respondent.

J. P. K. Bryan, for libelant.
Rountree & Carr, for claimant.

CONNOR, District Judge. The libel, answer, and report of the commissioner disclose the following facts, material to the decision of the controversy:

The libelant, Manchester Liners, Limited, a corporation created and organized under the laws of the kingdom of Great Britain, was on and

prior to May 27, 1908, the owner of the steamship Manchester Miller, and on said day, through the interposition of Robert M. Sloman, Jr., of Hamburg, Germany, entered into a contract of affreightment or charter party, partly printed and partly written, executed at Hamburg, with the Hamburg American Liner of Hamburg, Germany, whereby it was agreed that said steamship should receive on board at Hamburg from the charterers a cargo consisting of 2,855 tons of manure salt, etc., and that:

"The steamer being so loaded, after being dispatched by charterers, shall therewith proceed immediately to Wilmington, North Carolina, or so near thereunto as she can safely get and, on right and true delivery of the cargo, according to the bills of lading signed by the captain, be paid freight." etc.

The other provisions in the charter party material to be considered are:

"The steamer to be discharged at port of discharge at not less than an average of 300 tons per working day."

"The steamer to be discharged at one or two wharves at her expense, as ordered by consignees, within 24 hours after the steamer has been entered at customhouse, consignees guaranteeing sufficient depth of water, if at Wilmington, North Carolina, including factories outside of city limits."

By an indorsement in writing, on margin of charter party, steamer is authorized to fill up with 3,395 tons for Pensacola.

In compliance with the charter party, the charterers furnished to said steamer the cargo and R. M. Sloman, Jr., for the captain, signed bills of lading, dated June 30, 1908, and delivered them to the charterers, whereby he acknowledged receipt of said cargo from Kalisyudakat, G. B. M. H. Filiale, Hamburg, in apparent good order and condition. "Discharge of all other conditions as per charter party dated Hamburg, 27 May, 1908. To be delivered in like good order and condition at any place within the jurisdiction of the customhouse of Wilmington, North Carolina, unto G. Anseweric & Company, or to his or their assigns, freight to be paid at Wilmington, North Carolina. * * * All questions arising under this bill of lading are to be governed and decided by the laws of the empire of Germany, as administered in Germany."

Soon thereafter the steamer sailed from Hamburg and proceeded on her voyage, until the night of July 23, 1908, when she reached the outer bar or mouth of the Cape Fear river; here she came to anchor, and waited until the following morning at 5 o'clock, when she crossed the bar of said river at high tide, proceeded up the river, and anchored off the town of Southport, near the mouth of the river, about 30 miles below Wilmington. The draft of said steamer at that time in salt water was 24 feet, 5 inches, and, off Southport, where the water is partly fresh, 24 feet, 8 inches. The pilot stated to the captain that he could not take the ship higher up with safety until she was lightened. The captain came to Wilmington, leaving the steamer in the river off Southport, and entered her at the customhouse at Wilmington on July 24, 1908, having previously given consignees of said cargo, the Virginia-Carolina Chemical Company, claimants, notice that the said ship had arrived at Southport and offered to deliver it there, as it was as near Wilmington as it could safely get, which notice con-

signees refused to accept, and again when he got to Wilmington, which consignees accepted. Said consignees refused to accept the cargo at Southport, and demanded that the captain bring the ship to Wilmington, and deliver the cargo at Smallbone's wharf, in the upper part of the city, and the wharf at Navassa, the factory of said company, outside the city limits, and within the port of Wilmington. This the captain declined to do, because it was impossible for a ship drawing 24 feet to proceed up the river from Southport to said wharves, without being lightened some 17 or 18 inches. After consultation with the ship's agent at Wilmington, it was agreed between the captain and the agent of consignees that it was necessary to lighten the ship to avoid demurrage, and leave the question of liability for the cost and expense incurred to subsequent adjustment. Pursuant to this arrangement, tugs, lighterers, and laborers were employed by the ship's agent, and she was lightened by the removal of about 660 tons of her cargo, whereupon, on July 26th, the ship proceeded up the river to Smallbone's wharf, in the city of Wilmington, the average depth of water between Southport and Wilmington being about 21½ or 22 feet. After taking out a part of the cargo and delivering same to consignee at Smallbone's wharf, the ship went to the Navassa wharves, discharged, and delivered to consignee the remainder of the cargo. The consignee received the portion of the cargo, lightened from Southport to Wilmington, from the lighters at their own wharves. It was necessary in going up the river from Southport to Wilmington that the ship should have the assistance of a steam tug. The Sea King was employed by the ship's agent for that purpose, and performed the service. The cargo was entered at the customhouse in Wilmington on the 24th day of July, 1908, by the Virginia-Carolina Chemical Company, as the owner thereof, under the written declaration of Mr. B. S. Reynolds, the agent of said company, producing the bill of lading, and depositing the same with consular invoice in said customhouse, where they are now of record. The captain of the Manchester Miller, Robert S. Robertson, had never been in Wilmington, though he knew of the port as laid down on the chart of the Cape Fear river, which he had before leaving Hamburg. The expense of lightening the steamer, $1,071.82, found by the master to be reasonable and fair, was paid by the ship's agent and due notice given by the captain to consignee that it would be held responsible for said expense. The captain of the ship also paid for towing the steamer from Southport to Wilmington $100, and from Wilmington to Navassa and return $150. The commissioner finds that these amounts are fair and reasonable, but were not paid for lightening. The captain charges consignees with said amounts, also $10 amount paid for cost of bond in this suit, and $25 deposited with the clerk of this court. Demand was duly made on the Virginia-Carolina Chemical Company for these several amounts and payment refused, for that it was not liable therefor. Thereupon this libel was filed, the cargo attached, etc.

Upon the foregoing findings of fact, the commissioner finds, as a conclusion of law, that the libelant is not entitled to recover of the claimant the amount expended for lightening, towage, or the other expenditures. The libelant filed a number of exceptions to the re-

port of the commissioner. It is not necessary to note the exceptions separately. Many of them are directed to the failure of the commissioner to find specifically certain provisions of the charter party and the bill of lading. It is sufficient to say in regard to these exceptions that both papers are in evidence, and their provisions are open to the parties for such argument, inferences, or conclusions as they may be thought to sustain.

The first contention urged by libelant is that by a correct construction of the charter party and the bill of lading the ship had completed her voyage when she crossed the bar and anchored in the mouth of the river off Southport, that she was then "in the port of Wilmington," the point to which, by the charter party, she was under obligation to come. It will be observed that by the terms of the charter party:

"The steamer being so loaded, after being dispatched by charterers, shall thereupon proceed immediately to Wilmington, North Carolina."

The learned counsel for libelant insists that, in the light of other provisions in the charter party, the words "Wilmington, North Carolina," should be interpreted, "the port of Wilmington, North Carolina," and that this term includes any point within the jurisdiction of the customhouse of the port of Wilmington as laid off and designated by the Statutes of the United States. He calls attention to the provision in the charter party that "any difference in freight, if in charterer's favor, to be payable ten days after arrival at port of destination," and "the steamer to be discharged at port of discharge," and that the steamer is "to employ the charterers or their agents, stevedores, at the usual lowest rate at the port of loading and port of discharge." The learned counsel in his brief says:

"All through the charter, after the word 'Wilmington' has been mentioned, it is referred to in express terms as the 'port of destination,' 'the port of discharge,' and therefore the word 'Wilmington' means in the charter party the port of Wilmington."

Attention is called to other language found in the charter party, as tending to show that the port of Wilmington is the point of destination prescribed for the voyage, such as, "lay days to commence the day after the steamer has been entered at the customhouse and is ready to discharge." He further insists that the conduct of the captain in entering the steamer at the customhouse and notifying the agent of the consignees that the steamer, when off Southport, was ready to discharge her cargo, and that on July 24th the agent of the consignees, in entering the cargo in the customhouse in the port of Wilmington by written declaration and filing the bill of lading, shows that they so construed the charter party.

[1] The rule for construing charter parties is thus laid down:

"Charters and bills of lading are to be construed in the light of the nature and details of the adventure contemplated by the parties to them. The construction to be given them is not an unnecessarily strict one, but such a one, as with reference to the context and the object of the contract, will best effectuate the obvious and expressed intent of the parties. They are to be construed according to their sense and meaning, as collected in the first place, from the terms used in their plain, ordinary, and popular sense, unless they

have generally, in respect to the subject-matter, as by the known usage of trade, or the like, acquired a peculiar sense, distinct from their popular sense, or unless the context evidently points out that they must, in the particular instance, and in order to effectuate the immediate intention of the parties, be understood in some special and peculiar sense." Scrutton, Charter Parties and Bills of Lading, p. 10.

When contracts are partly printed and partly written, the written clause should usually prevail as clearly expressing the intention of the parties. Id. 22. It is an equally well-settled rule, applicable to such contracts, that, if possible, the written and printed provisions should be construed together, and, so far as possible, harmonized. 7 Am. & Eng. Enc. 188.

Taking judicial notice of the commercial and geographical conditions and location, it is found that the city of Wilmington, N. C., is situate on the north bank of the Cape Fear river, about 30 miles from its mouth; that it is the chief seaport and commercial city of the state, containing about 30,000 inhabitants, and engaged in considerable import and export trade. It is in evidence that the Virginia-Carolina Chemical Company has wharves at Navassa, several miles above the city. The character of the cargo, manure salt, or kainitt, indicates clearly the use for which it is imported. Southport is a small town lying near the mouth of the Cape Fear river. There is nothing in the language used by the parties in the evidence, or in the conditions, of which judicial notice can be taken, to indicate, or even suggest, that Southport was the "port of destination" or "port of discharge" of the ship or its cargo. If libelants' contention is sustained, it must, of necessity, be based upon the proposition that "Wilmington, North Carolina," written in the charter party, fixing the destination of the ship, is so controlled by the printed terms as to make the point of destination anywhere within the limits of the "port of Wilmington" as laid out and prescribed by the federal government for the purpose of collecting custom duties and regulating pilotage. By reference to 2 Fed. Stat. Anno. p. 544, we find that the "district of Wilmington comprises all the waters and shores south of the district of Beaufort to the southern boundary of the state of North Carolina." By further reference to the boundaries of the district of Beaufort and the southern boundary of the state, it appears that, if libelants' contention be correct, her captain might select any point within a distance of many miles along the coast for discharge. This certainly was not the intention of the parties when they made the contract. Any doubt as to what constitutes the "Port of Wilmington" for the purpose of making entry, etc., is removed by the statute, which, after defining the limits of the "district of Wilmington," concludes "in which Wilmington shall be the port of entry."

[2] The bill of lading states that the "steamship Manchester Miller is bound to Wilmington, North Carolina," and contains the words, in writing, after describing the cargo, "Each lot to be delivered separately by itself. Discharge of all other conditions as per charter party, dated Hamburg, 27 May, 1908;" and printed, "to be delivered * * * within the jurisdiction of the customhouse of the aforesaid port of Wilmington, North Carolina." The charter party contains the words:

"Captain to sign bills of lading as presented to him without prejudice to this charter party." These words cannot control the language of the charter party.

[3] In Sailing Ship Garston v. Hickie (1885) 15 Q. B. D. 580, it is held that the term "port" is to be taken in its business, popular, or commercial sense, and not in its legal definition for revenue or pilotage purposes. Willes, J., says:

"When there is a legal port, what is meant by the use of the expression 'popular sense' or 'commercial sense' of the word 'port'? One can well understand that the revenue port is not the thing to be looked at, because the boundaries of a revenue port have been established merely for the sake of the convenient collection of customs, and have nothing to do with the mercantile or nautical meaning of the word 'port,' as applied to a particular place. * * * I think that, when a port exists in the true acceptation of the term, the popular or commercial sense is identical with the legal sense."

Brett, J., on appeal, says:

"It is not to be the fiscal port; the parties are not contracting with regard to that. The fiscal port, the limits of which are always fixed by the act of Parliament, is never in fact taken into consideration by shippers or merchants employing ships. We all know that. We know also as a fact that the limits of many pilotage authorities extend far beyond anything which would be called in the ordinary sense 'the port' of a particular place. Therefore, the word 'port' in a charter party does not necessarily mean an act of Parliament 'pilotage port,' or, which is a better word, 'pilotage district.' * * * What do they intend? They intend the port as commonly understood by all persons who are using it as a port; that is, for sailing to or from it with goods and merchandise."

Bowen, L. J., says that it is a question of fact "what the word 'port' means in a charter party. The destination of the ship, with her cargo, is fixed by the charter party as 'Wilmington, North Carolina.'" The references in the printed part of the charter party to "port of discharge," "port of destination," etc., may easily be reconciled with the word "Wilmington, N. C.," fixing the place to which she is to come. Any apparent conflict disappears when it is noted that Wilmington is made by the statute the "port of entry" of the Fourth district.

[4] The conclusion from any port of view is irresistible that the steamship Manchester Miller had not completed her voyage when she anchored in the mouth of the river off Southport—that the charter party obliged her to proceed "to Wilmington, North Carolina." The act of the captain in entering her in the customhouse in Wilmington, while she was anchored 30 miles below the city, could not change, or in any manner affect, the terms of the contract; nor could the act of the agent of the consignees do so. This conclusion disposes of the exception to so much of the report as pertains to this phase of the controversy.

[5] Conceding that the ship was under obligation to proceed to Wilmington, N. C., claimant is confronted with a limitation expressed in the contract, upon this obligation by the clause "or as near thereunto as she can safely get." This clause is usually found in charter parties. Its construction has been the subject of much discussion, it seems, with differing conclusions in the admiralty courts of different countries. This charter party is made at Hamburg, Germany. The charterer is a German company. The owner is a British corporation.

The Manchester Miller is a British ship. The charter party is in the English language. The ship takes on her cargo in a German port to be delivered in an American port. It is conceded that, to ascertain what effect the limiting clause has upon the rights and liability of the parties for the expense incurred in lightening the ship to enable her to complete the voyage, we must ascertain to what country we shall go for a construction of the clause. It is conceded that, by reason of the depth of the water in the Cape Fear river and the draft of the Manchester Miller, she could not, with her cargo, "safely get" beyond the point at which she anchored and at which she was lightened of a part of her cargo. Libelant insists that, while by the general rule the law of the place where the contract is made controls, the facts in the record bring the case within the exception recognized by the courts; that the clause limiting the obligation of the ship to proceed to Wilmington, N. C., must be construed by the law of England, as found in the decisions of the courts of that country. There is no evidence or finding by the commissioner as to the law of England applicable to the facts in this case. Decisions of English courts are cited in the brief of libelants' counsel. Claimant insists that the clause in controversy must be construed in the light of the law of the German Empire as decided by the courts of that country. Evidence is introduced, and the commissioner finds as a fact, what the law of the German Empire is. It is well settled that, when a contract is made in one country and its enforcement sought in the courts of another country, the law of the loci contractus must be shown by competent evidence and found by the court as a fact. In the absence of such evidence, the court will apply the law of the forum. Liverpool Steam Co. v. Phœnix Insurance Co., 129 U. S. 397, 446, 9 Sup. Ct. 469, 32 L. Ed. 788. The exception noted in The New York, 175 U. S. 187, 20 Sup. Ct. 67, 44 L. Ed. 126, does not affect the question presented here. Unless, therefore, the claimant has sustained its contention that the law of Germany controls the construction of the clause, resort must be had to the law of this country.

The Supreme Court in Liverpool Steam Company v. Phœnix Insurance Company, supra, quotes with approval the following:

"The general rule is that the law of the country where a contract is made governs as to the nature, the obligation, and the interpretation of it. The parties to a contract are either the subject of the power then ruling or, as temporary residents, owe it a temporary allegiance; in either case equally they must be understood to submit to the law then prevailing and to agree to its action upon their contract. It is, of course, immaterial that such agreement is not expressed in terms. It is equally an agreement in fact presumed de jure, and a foreign court interpreting and enforcing it on any contrary rule defeats the intention of the parties, as well as neglects to observe the recognized comity of nations." Lord Justice Turner in Peninsular & Oriental Company v. Shand, 3 Moore, P. C. (N. S.) 272, 290.

"The presumption is in favor of the place of the contract. He who asserts the contrary has the burden of proof." Mutual Life Insurance Co. v. Cohen, 179 U. S. 262, 21 Sup. Ct. 106, 45 L. Ed. 181.

The learned counsel for libelant contends that it is an English contract, and to be interpreted by English law. For this purpose he relies upon the fact that the owner of the ship—The Manchester Liners, Limited—is an English company, that the Manchester Miller is an English ship, and that the charter party is printed and written in the

English language. It must be conceded that these facts are pertinent and proper to be considered in arriving at the intention of the parties in respect to the law by which their contract is to be governed. On the contrary, it appears that the charterer, the Hamburg American Liner, is a Hamburg company; the charter party is signed, for the owner, by R. M. Sloman, Jr., of Hamburg; the cargo is to be taken on at Hamburg. The bill of lading is signed for the captain by R. M. Sloman, Jr., and contains the following clause:

"All questions arising under this Bill of Lading are to be governed and decided by the law of the empire of Germany as administered in Germany."

It is conceded that this clause applies only to the bill of lading, and cannot be invoked to the prejudice of the parties under the charter party, but it is executed pursuant to the terms of the charter party, and is relevant upon the inquiry as to the law of the country which the parties had in view, and in respect to which they were contracting. The libelant stresses the case of Lloyd v. Guibert, 6 B. & S. 100; s. c.; L. R. 1 Q. B. 515. There a French ship owned by a Frenchman was chartered by the master, in pursuance of his general authority as such, in a Danish West India island to a British subject, who knew her to be French, for a voyage from St. Marc in Hayti to Havre, London, or Liverpool, at the charterer's option, and he shipped a cargo from St. Marc to Liverpool. On the voyage the ship sustained damage from a storm which compelled him to put into a Portuguese port. There the master lawfully borrowed money on bottomry and repaired the ship, and she carried her cargo safe to Liverpool. The bondholder proceeded, in an English Court of Admiralty, against the ship, freight, and cargo, which being insufficient to satisfy the bond, he brought an action at law to recover the deficiency against the owners of the ship. They abandoned the ship in such a manner as, by the French law, absolved them from liability. It was held that the French law governed the case. After making the foregoing statement, Mr. Justice Gray, in Liverpool Steam Co. v. Phœnix Insurance Co., supra, says:

"The decision was, in substance, that the presumption that the contract should be governed by the law of Denmark in force when it was made was not overcome in favor of the law of England by the fact that the voyage was to an English port and the charterer an Englishman, nor in favor of the law of Portugal, by the fact that the bottomry bond was given in a Portuguese port; but that the ordinary presumption was overcome by the consideration that French owners and an English charterer making a charter party in the French language of a French ship in a port where both were foreigners," etc.

The distinguishing feature between that case and this is in the fact that here the charterer was a German company and the agent executing the charter party was a resident of Hamburg, Germany. The general rule is stated by Mr. Justice Willes:

"It is generally agreed that the place where the contract is made is prima facie that which the parties intended or ought to be presumed to have adopted as the footing upon which they dealt, and that such law ought, therefore, to prevail in the absence of circumstances indicating a different intention."

Lord Justice Lindsey says:

"The intention of the parties is the crucial test."

Mr. Justice Gray in the Phœnix Insurance Company Case, supra, after an exhaustive review of the authorities, says:

"The review of the principal cases demonstrates that according to the great preponderance, if not the uniform concurrence of authority, the general rule that the nature, the obligation, and the interpretation of a contract are to be governed by the law of the place where it is made, unless the parties, at the time of making it, have some other law in view, requires a contract of affreightment, made in one country between citizens or residents thereof and the performance of which begins there to be governed by the law of that country, unless the parties, when entering into the contract, clearly manifest a mutual intention that it shall be governed by the law of some other country."

After giving due consideration to the status of the parties to this contract, the place at which it was executed, and all other relevant facts, it does not sufficiently appear that either the English or American law was in the contemplation of the parties to rebut the presumption that they were contracting with reference to the German law as the rule for its interpretation. While not controlling, it is persuasive, that such was their intention when they expressly so provide in the bill of lading which should be construed with the charter party. It would be a strained conclusion to hold that they intended that the English law should control in respect to the terms of the charter party and the German law as to the bill of lading.

[6] This conclusion brings us to the inquiry, What is the German law in regard to the clause in controversy, or what interpretation does the German law give to the words, "Or as near thereunto as she can safely get"? The answer to this question involves the inquiry whether there is any competent evidence in that regard, and, if so, what does it show? Claimant recognizing that it was incumbent upon it to show, as a fact, the German law, introduced Paul C. Schnitzler, of whom the commissioner finds that:

"He was an attorney and counselor at law practicing in New York City, and had practiced there for 15 years; that he was familiar with the laws of Germany, had studied law at the universities at Heidelberg and Leipsic for 3½ years, had obtained the degree of doctor of laws from the University of Leipsic, practiced law in Germany for five years, had held various positions, among others clerk of the Appellate Division of the Supreme Court of Karlsruhe, was acting district attorney at Heidelberg and acting judge of the District Court at Lahn, Baden, and since coming to this country had made a specialty of advising in matters involving German law; that he had also studied the maritime law of Germany and the decisions of German courts in connection therewith, and during his practice as lawyer and judge in Germany had on various occasions to decide and take up matters involving the admiralty law; that he is also familiar with the judicial construction of the clause, 'As near thereunto as she may get' in bills of lading, etc., and made a special study of the construction given the clause by the courts of Germany in connection with this case and had examined a number of German books treating of the German law of admiralty and a number of decisions treating of said clause. I find the said Paul C. Schnitzler to be an expert."

To this finding libelant especially excepts. Tested by any of the standards prescribed for the qualification of a witness in such cases, there can be no doubt that the conclusion of the commissioner is correct. Wigmore, Ev. §§ 564–690. There was no contradictory evidence.

[7] The commissioner found, from the uncontradicted evidence, as a fact, that:

"According to the maritime and admiralty law of Germany, and the construction of the clause 'as near thereunto as she may safely get,' by the courts of Germany, the master is only relieved from proceeding with his ship and cargo to the port, but not from his obligation to deliver the cargo at his expense in the port of destination, unless a contrary intention appears in the agreement between the master and consignee; for instance, 'Lighterage, if any, to be at the expense of the receiver.'"

This finding is based upon and sustained by the evidence of Mr. Schnitzler. He says that the construction of this clause by the German court is at variance with the English jurisprudence, and the German court in various decisions does so expressly state; that he has examined a number of German books treating of the Law of Admiralty and a number of decisions treating on this clause, some of which he has before him. The witness read from the decision of the Appellate Division of the Supreme Court of Hamburg as to the master of the ship in the case of Glenfarg v. Siemers & Co., reported in the Hanseatic Law Gazette, No. 11, March 30, 1892, in which it is said, that "the German practice is at variance with the English rule," and it cites a number of decisions under which the cost of lighterage was imposed on the master. The decision, following a decision of the German Imperial Court of Appeals, reported in volume 14, page 116, of the published decisions of the said German Imperial Court, holds that in case the port of destination is agreed upon—that is to say, named in the papers—the clause "so near thereunto," etc., makes it obligatory for the master to go as near the port of destination as possible, but confers upon the master the right to forward to the place of discharge of the cargo or part thereof in lighters, instead of in the ship, but, in such event, the court holds that the right of the master to be reimbursed for the cost of such lighterage cannot be presumed. Such right to be reimbursed must be especially agreed upon; as for instance, by the clause, "Lighterage, if any, for risk and expense of the receiver of the cargo." The witness cited the case of Dansfuss & Co. v. S. G. Olsen, Master of the ship Elplingstone, reported in the Hanseatic Law Gazette, No. 50, dated December 10, 1894, in which language of the charter party was: "Proceed to Cuxhaven, or so near thereunto as she may get, always afloat." The court said:

"This clause did not bind the plaintiff to receive the cargo on the river instead of in the port, or to pay the expense of lighterage, but it only entitled the master to decline, in this case, to proceed to the port with the ship, without affecting thereby his obligation to deliver the goods at his expense at the port of destination."

The witness produces and attaches to his deposition two copies of the Hanseatic Law Gazette, a publication issued for the purpose of publishing decisions of the German Hanseatic cities, containing the decisions referred to in his testimony. This being the only evidence before the commissioner in regard to the decisions of the German

court, construing and applying the clause in the charter party, he could not have reached any other conclusion than—

"that under the facts of the case and the law governing the charter party it was the duty of the master of the steamer Manchester Miller to proceed to and deliver his cargo at the city of Wilmington, N. C., to the consignee thereof, and that, when he found upon his arrival in the Cape Fear river that the depth of the water in the river between Southport (off which place he anchored) and Wilmington was insufficient to permit his taking the ship as loaded and cargo to Wilmington, it was his further duty to have lightened his ship by discharging so much of the cargo into lighters as was necessary to reduce the draft of his ship sufficiently to enable him to proceed up the river to Wilmington, sending a part of the cargo in lighters and taking the balance in the steamer, and deliver the whole cargo to the consignees at Wilmington, and that the expense incurred in lightening the steamer and taking her to Wilmington in order to complete the voyage and delivery should be borne by the steamer or her owners."

Whatsoever opinion may be entertained in respect to the reasonableness of the differing constructions to the clause by the English and German courts, the fact that, as found by the commissioner, in accordance with the general rule and the uncontradicted testimony, that the parties intended to contract in view of the German law, is conclusive upon this court. It will be observed that, as shown by the notes in Scrutton on Charter Parties (page 82), the English authorities are not altogether uniform. The fact that the captain of the Manchester Miller had the chart of the Cape Fear river showing depth, etc., before sailing, is persuasive as showing that he signed the bill of lading with reference to the condition which he must have known he would encounter upon crossing the bar at the mouth of the Cape Fear river. Whether the charterer had any such knowledge does not appear. While the cross-examination of Mr. Schnitzler weakened somewhat the extent and thoroughness of his knowledge of the German law, it failed to discredit him in respect to the decisions cited by him. How far both English and German decisions are affected by local customs and conditions does not appear. That there is a marked variance between them is manifest. The conclusion reached by the commissioner, in which I concur, excludes the claim made by libelant for expense of lightening and towing from Southport to Wilmington. There is no evidence tending to show that, after reaching Wilmington, the depth of water was insufficient to enable the ship to reach Smallbone's wharf. It would seem that her movement from Southport to the wharf was continuous. Ordinarily, she would, upon reaching some convenient point in the river at Wilmington, have anchored and notified the consignee awaiting their destination of the wharf to which she should go to discharge her cargo. In the peculiar condition brought about by the course pursued by the captain upon the assumption that she had completed her voyage when at Southport, this ordinary and usual course was not pursued. There is no evidence as to the depth of the water at Wilmington, nor at the Smallbone's wharf. There is no evidence that, either by custom or law, any harbor limits have been fixed within which a ship may claim to have reached the end of a voyage to Wilmington and at which she is entitled to anchor, and demand that a wharf be designated by the consignee to which she shall go for

the purpose of discharging her cargo. The only finding by the commissioner is that it was necessary that she should have the assistance of the tug to bring her up the river from Southport to Wilmington. For that service the claimant is not liable. There is evidence, by claimant's own witness, that it was necessary that she should have such assistance to proceed from Wilmington—that is, the city limits—to Almont and Navassa. Edgar Williams, a witness for claimant, speaking of large ships, as the Manchester Miller, says:

"They can't get along without one. The river is so narrow that it is necessary to have a tug boat to pull them around the bend and enter them in the drawbridge."

Capt. Robertson says that, after "lightening sufficiently to go that draft" (20 feet, 6 inches), she went to the Navassa wharf. It was very awkward to get to." This is the only evidence bearing upon the conditions between the Smallbone's and the Navassa wharf. The guaranty by the consignee was that the water should be "of sufficient depth" at the wharves. There does not appear to be any evidence tending to show that the depth of the water was insufficient, but that the bend in the river, etc., created the necessity for the assistance of the tug to enable her to go to the Navassa wharf.

Upon a careful consideration of the entire record, with the aid of the well-considered report of the commissioner, I am of the opinion that the exceptions should be overruled and the report confirmed. A decree may be drawn accordingly.