MANCHESTER LINERS, Limited, v. VIRGINIA-CAROLINA CHEMICAL CO.

(Circuit Court of Appeals, Fourth Circuit. March 11, 1913.)

No. 1,123.

1. SHIPPING (§ 47*)—CONSTRUCTION OF CHARTER PARTY—"PORT OF DISCHARGE."

Where the "port of discharge" designated in a charter party at which the vessel is to discharge at her expense is one at which there is a custom house, the word "port" is to be construed in its ordinary and commercial sense as meaning the particular place named, and not as permitting a discharge at any place within the revenue port or district for which the place is the port of entry.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 182, 183; Dec. Dig. § 47.*

For other definitions,. see Words and Phrases, vol. 6, pp. 5456, 5457.]

2. SHIPPING (§ 34*)—CHARTER PARTY—LAW GOVERNING CONSTRUCTION.

A charter of an English ship, owned by an English company, to a German company, for the carriage of a cargo from Germany to the United States, made in Germany, held governed as to its construction by the law of Germany,. where the general presumption that such was the intention of the parties is strengthened by an express provision to that effect in the bill of lading.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 120; Dec. Dig. § 34.*]

3. SHIPPING (§ 47*)—CONSTRUCTION OF CHARTER PARTY—COST OF LIGHTERAGE—GERMAN LAW.

Under the admiralty and maritime law as administered in Germany, a clause in a charter party requiring the ship to discharge at a port

---

named "or as near thereunto as she can safely get" relieves the master from proceeding with his ship and cargo to the port where the water is not of sufficient depth, but not from his obligation to deliver the cargo at his expense in the port of destination, unless a contrary intention appears, and the vessel is liable for the expense of necessary lighterage.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 182, 183; Dec. Dig. § 47.*]

Appeal from the District Court of the United States for the Eastern District of North Carolina, at Wilmington; Henry G. Connor, Judge.

Suit in admiralty by the Manchester Liners, Limited, owner of the steamship Manchester Miller, against the Virginia-Carolina Chemical Company, claimant of the cargo of the said Manchester Miller. Decree for respondent, and libelant appeals. Affirmed.

For opinion below, see 194 Fed. 463.

J. P. K. Bryan, of Charleston, S. C., for appellant.

George Rountree, of Wilmington, N. C. (J. O. Carr, of Wilmington, N. C., on the brief), for appellee.

Before GOFF, Circuit Judge, and WADDILL and ROSE, District Judges.

WADDILL, District Judge. This is an appeal from a decree in admiralty of the United States District Court for the Eastern District of North Carolina, sitting at Wilmington, rendered on the 24th day of January, 1912. The facts of the case material to the controversy, briefly are as follows:

The appellant, libelant in the lower court, Manchester Liners, Limited, a corporation created and organized under the laws of Great Britain, was, on the 27th day of May, 1908, the owner of the steamship Manchester Miller, and on that date, acting through a representative at Hamburg, Germany, entered into a contract of charter party, partly printed and partly written, with the Hamburg-American Liners of Hamburg, Germany, whereby it was agreed that the steamship should receive on board at Hamburg, from the charterers, a cargo of 2,855 tons of manure salt, and that:

"The steamer being so loaded, after being dispatched by the charterers, shall therewith proceed immediately to Wilmington, N. C., or so near thereunto as she can safely get, and, on right and true delivery of the cargo according to the bill of lading signed by the captain, be paid freight," etc.

The charter also contained the following:

"The steamer to be discharged at one of two wharves at her expense, as ordered by the consignees within 24 hours after the steamer has been entered at the custom house, consignee guaranteeing a sufficient depth of water, if at Wilmington, N. C., including factories outside the city limits."

By an indorsement in writing on the margin of the charter party, the steamer was authorized to fill up with 3,395 tons for Pensacola. Pursuant to the charter party, the charterers furnished to the steamship the cargo, and the bill of lading was duly signed for the ship's master on the 30th day of June, 1908, and delivered to the charterers, whereby receipt of the cargo was acknowledged from Kalisyndapat

G. B. M. H. Filiate, Hamburg, in apparent good order and condition, "discharge and all other conditions as per charter party dated May 27, 1908, * * * to be delivered in like good order and condition at a place within the jurisdiction of the custom house of Wilmington, N. C., unto order of G. Amsinck & Co., or to his or their assigns, freight to be paid at Wilmington, N. C.," with the further proviso that:

"All questions arising under this bill of lading are to be governed and decided by the laws of the empire of Germany as administered in Germany."

Thereafter the steamship sailed from Hamburg and proceeded on her voyage, reaching the outer bar or mouth of Cape Fear river on the night of the 23d of July, 1908, where she anchored, and waited until the following morning at 5 o'clock, and at high tide crossed the bar and proceeded up the river, and anchored off the town of Southport, a short distance up the river, and about 30 miles below Wilmington. The draft of the steamer in salt water was 24' 5", and off Southport, where the water was partly fresh, 24' 8". Being advised that it was unsafe and impossible to proceed up the river without lightering the cargo, the average depth of water between Southport and Wilmington being only between 21' 6" and 22', the master came to Wilmington, leaving his ship off Southport, and there, on the 24th of July, entered her arrival at the custom house, and the cargo was likewise on the same day entered by the claimant company. Notice was given to the Virginia-Carolina Chemical Company, the consignee, and claimant herein, of the arrival of the cargo at Southport, and the ship's master offered to deliver the cargo there, as it was as near Wilmington as the ship could safely get. This delivery consignee refused to accept, and demanded that the master deliver the cargo at Smallbones wharves, in the upper part of the city, and a wharf at Navasaw, a factory of the claimant, outside the city limits, and in the port of Wilmington. This the master declined to do, because it was impossible for a ship drawing 24 feet of water to proceed up the river from Southport to said wharves, without being lightened some 17 or 18 inches. It was thereupon agreed between the master and the ship's agent at Wilmington, and the agent of the consignee, with a view of avoiding demurrage, to lighten the ship, and leave the question of liability, and the cost and expense incurred, for subsequent adjustment; and following out this arrangement, tugs, lighters, and laborers were employed by the ship's agent, and 660 tons of cargo removed from the ship, and thereafter, on the 26th of July, she proceeded up the river to the wharves mentioned, and duly discharged her cargo, the portion taken by the lighters being likewise discharged at the wharves. The expense incurred in this lightering was $1,071.82, which was paid by the ship, as was also $100 for towing the steamer from Southport to Wilmington, and $150 from Wilmington to Navasaw and return, and upon demand being made upon the consignees for payment of the same, and refusal thereof, the libel was filed.

After maturity of the case, the questions at issue were referred to a commissioner, who took the evidence and reported adversely to the libelant, which report was duly confirmed, the libel dismissed, and this appeal taken.

[1] The case turns almost entirely upon the interpretation to be given to the language used in the charter party, namely: (a) "The steamer being so loaded, after being dispatched by the charterers, shall proceed therewith immediately to Wilmington, N. C., or so near thereunto as she can safely get, and, on the right and true delivery of the cargo according to the bills of lading signed by the captain, be paid freight," etc.; (b) the steamer is to be discharged at one of two wharves at her expense as ordered by the consignees within 24 hours after the steamer has been entered at the custom house, consignees "guaranteeing sufficient depth of water, if at Wilmington, N. C., including factories outside of city limits"; (c) what law should be applied in the interpretation of the charter party and bills of lading, especially in determining the meaning of the language in the charter party to proceed "to Wilmington, N. C., or so near thereunto as she can safely get"; (d) the effect of the provision in the bill of lading that "(15) all questions arising under this bill of lading are to be governed and decided by the law of the Empire of Germany, as administered in Germany; and (e) incidentally, the construction to be given the phrase in the charter party "to proceed to Wilmington, N. C., or so near thereunto," etc., in the light of the terms in the bill of lading as to the delivery of the cargo, namely, that the same was to be delivered "in like good order and condition at any place within the jurisdiction of the custom house of the aforesaid port of Wilmington, N. C., to consignee's order or his or their assigns," etc.—the appellant and libelant's contention being that the ship's arrival at Southport brought her within the terms of the last-named provision of the bill of lading, and entitled them to deliver the cargo there.

The questions thus presented were elaborately and fully considered by the commissioner to whom the case was referred, and the judge of the lower court, and the conclusions of the latter were, briefly:

First. That the arrival at Southport, while a place within the Wilmington customs district, was not the arrival as contemplated in the charter party and bill of lading; the meaning of the contract of affreightment being that the ship should bring the cargo to the harbor or port of Wilmington, as distinguished from merely into the customs district, and deliver the same at its wharves, and not down the river 30 miles below Wilmington.

[2] Second. That the contract having been made in Germany, by a German company, for delivery of a cargo from Germany to a place in the United States, should be construed, especially in the light of the provision in the bill of lading, according to German law, and not of either the laws of the United States, where the cargo was delivered, or those of Great Britain, where the ship's owners resided.

[3] Third. That whatever may be the interpretation placed upon the language "or as near thereunto as she can safely get," under the law of Great Britain, as to which there seems to be some contrariety of view, under the admiralty and maritime law as administered in Germany, the master is not relieved by the use of such language from delivery of the cargo at the ship's expense to the final point of destination, although the ship itself may not be able to proceed thereto, un-

less the contrary intention appears in the agreement, as, for instance, lighterage, if any, to be at the expense of the receiver of the cargo, which provision did not exist in this case.

The results thus arrived at in the last three paragraphs are conclusive of this case, unless the provision of the charter party respecting the guaranty of a sufficient depth of water brings about a different result.

Fourth. The decision of the lower court on this subject was that the guaranty by the consignee as to the depth of water did not apply to the waters of Cape Fear river between Southport and Wilmington, but to the waters at the wharves within the harbor of Wilmington, and that there was nothing to indicate lack of sufficient depth of water there.

Upon full consideration by this court of the questions presented in the record, and by the assignments of error, viewed in the light of the clear and exhaustive arguments of proctors for the respective parties, we have reached the conclusion that the judgment of the lower court is in all respects free from objection, and there was no error committed in any ruling in the case, or upon any of the points especially enumerated. To the decision of the lower court, found in 194 Fed. 463, special reference is here made, as containing a comprehensive statement of the facts of the case, as also an able and interesting review of the law applicable thereto, and with the conclusion reached we are in full accord, particularly as respects the points hereinbefore specifically referred to, which are conclusive of the merits of the controversy.

The decree of the lower court will be affirmed, with costs.

Affirmed.